UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Charles Clinton,<br><br>    *Plaintiff*,<br><br>v.<br><br>Baxter International Inc. *et al.*,<br><br>    *Defendants*. | No. 25 CV 3368<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

    Baxter International Inc. ("Baxter") sponsors a retirement plan ("the Plan") for its employees. The Plan includes a stable value fund, which provides plan participants a low-risk investment option that protects their assets. Charles Clinton, who invested in the fund, filed this putative class action lawsuit against Baxter and its Investment Committee based on the fund's comparatively low returns. He alleges that they violated their fiduciary duties, as set forth in the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1101 *et seq.* Baxter, on behalf of itself and its Investment Committee, has moved to dismiss [Dkt. 18.] For the following reasons, the court grants the motion without prejudice.

**I.    Background[1]**

    Baxter, an Illinois-based health care corporation, sponsors a defined contribution retirement plan for its employees. [Dkt. 1 ¶¶ 2, 28.] The Plan, whose assets are managed by Baxter's Investment Committee ("the Investment Committee"), [*id.* ¶ 42], is among the nation's largest—both in terms of assets and participants. [*Id.* ¶¶ 12, 14.] From 2019 to 2023 ("the Class Period"), it consistently held more than $2 billion in assets, including more than $4 billion by 2023. [*Id.* ¶¶ 10–11.] Nearly 30,000 employees participated in the Plan in 2023, up from nearly 21,000 in 2019. [*Id.* ¶ 14.] As of 2019, only 0.1 percent of 401(k) plans in the country held as many assets. [*Id.* ¶ 12.] And in 2020, just 194 defined contribution plans (which include 401(k), 401(a), and 403(b) plans) claimed between 20,000 and 29,999 participants. [*Id.* ¶ 14.]

    Upon enrollment, participants may direct contributions into any of eighteen investment options, including the Stable Income Fund ("the SIF"), a synthetic stable value fund ("SVF"). [*Id.* ¶¶ 56, 79.] SVFs, like the SIF, are "intended to provide

---

[1]     The court accepts as true plaintiff's well-pleaded allegations and draws all reasonable inferences in his favor. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 522 (7th Cir. 2023).

1

participants with an option that protects their assets and is shielded from risks of loss." [*Id.* ¶ 77.] The SIF consists of four Guaranteed Insurance Contracts ("GICs") with insurance companies, which provide for guaranteed rates of return, or crediting rates, during a specified period. [*Id.* ¶¶ 58, 78.] The insurance companies establish the crediting rates. [*Id.* ¶ 81.]

Charles Clinton participated in the Plan and invested in the SIF. [*Id.* ¶ 25.] He alleges, based on information available in Form 5500 disclosures, [*id.* ¶ 85 n.9], that the SIF "provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants." [*Id.* ¶ 16.] Specifically, he alleges that throughout the Class Period, "identical or substantially identical stable value funds with higher crediting rates," were available but not selected. [*Id.* ¶ 84.] Therefore, by selecting and retaining the GICs, and by failing to "demand[] higher crediting rates from the Insurance Companies and/or [] submit[] requests for proposals to the Insurance Companies and other providers of stable value investments," Baxter failed to maximize his returns. [*Id.* ¶¶ 88–89, 94.]

His conclusions are based on crediting rate comparisons between the SIF and four to six comparator SVFs each year from 2019 to 2023. [*See id.* ¶ 85.] He identifies fifteen unique comparators, none of which have crediting rates listed for all five years.[2] [*Id.*] From this, he calculates the following:[3]

| Year | Baxter SIF Average Rate of Return | Comparator Average Rate of Return | Baxter SIF Percentage of Underperformance |
|---|---|---|---|
| 2019 | 2.77% | 3.94% | 29.70% |
| 2020 | 1.09% | 3.75% | 70.93% |
| 2021 | 1.92% | 4.19% | 54.18% |
| 2022 | 2.43% | 4.06% | 40.15% |
| 2023 | 2.68% | 3.85% | 30.39% |
| Average Underperformance during Class Period | | | 45.07% |

Under ERISA, Baxter ("the Company") and its Investment Committee are plan fiduciaries, held to "strict fiduciary duties of loyalty and prudence." [*Id.* ¶¶ 1–3.] These require them to "act 'solely in the interest of the participants and beneficiaries,' 29 U.S.C. § 1104(a)(1)(A), with the 'care, skill, prudence, and diligence' that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B)." [*Id.* ¶ 3.]

---

[2] Two appear every year from 2019 to 2022. Four appear twice, three of which non-consecutively. The rest, just once. [*See* Dkt. 1 ¶ 85.]

[3] "For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance." [Dkt. 1 ¶ 85 n.9.] Baxter disputes this methodology, as well as Clinton's averaging of the GICs. *See infra* Part III.A.2.

Alleging that the Investment Committee "selected and retained investment options in the Plan despite poor performance in relation to other comparable investments," and that the Company failed to monitor and remove Investment Committee members, Clinton filed suit for breaches of the fiduciary duty of prudence and the duty to monitor, respectively. [*Id.* ¶¶ 94, 102.]

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. To survive a motion to dismiss under Rule 12(b)(6), "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). *See also Hughes v. Northwestern Univ.*, 63 F.4th 615, 628 (7th Cir. 2023) ("Plausibility is the basic test for pleadings on a motion to dismiss.") Although the court takes well-pleaded factual allegations as true, conclusory allegations are insufficient to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In putative ERISA class actions, Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Courts apply a 'careful, context-sensitive scrutiny of a complaint's allegations' to 'divide the plausible sheep from the meritless goats.'" *Id.* (quoting *Dudenhoeffer*, 573 U.S. at 425). "Courts must give due regard to alternative explanations for an ERISA fiduciary's conduct," but only "*obvious* alternative explanations must be overcome at the pleadings." *Hughes*, 63 F.4th at 629–630 (emphasis in original).

## III. Analysis

### A. Duty of Prudence

"To state a breach of the duty of prudence under ERISA, a plaintiff must plead (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Albert*, 47 F.4th at 579 (7th Cir. 2022) (internal citation and quotations omitted). Here, the parties contest the second prong.

Clinton alleges that the Investment Committee breached its fiduciary duty of prudence by "select[ing] and retain[ing] investment options in the Plan despite poor performance in relation to other comparable investments." [Dkt. 1 ¶ 94.] Specifically, he takes issue with the SIF's "underwhelming crediting rates" and contends that a "prudent fiduciary" could have secured higher crediting rates for plan participants by "demanding higher crediting rates from the Insurance Companies and/or by

3

submitting requests for proposals to the Insurance Companies and other providers of stable value investments." [*Id.* ¶¶ 85, 88.]

"[T]he ultimate outcome of an investment is not proof of imprudence." *Albert*, 47 F.4th at 579. Plan fiduciaries, however, have "'a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Hughes*, 63 F.4th at 626 (quoting *Tibble v. Edison International*, 575 U.S. 523, 529 (2015)). Courts have also recognized as plausible a fiduciary's ability to leverage its bargaining power in negotiations. *See id.* at 636; *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 187 (3d Cir. 2024); *England v. DENSO Int'l Am. Inc.*, 136 F.4th 632, 635 (6th Cir. 2025).

Baxter correctly states that "simply 'pointing to another investment that has performed better . . . does not plausibly plead an imprudent decision." [Dkt. 19 at 12 (citing *Abel v. CMFG Life Ins. Co.*, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024)).][4] This is because "the prudence standard is processed-based, not outcome-based." *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020). But allegations relating to the Investment Committee's process (or lack thereof) in selecting and retaining underperforming funds—and failing to negotiate accordingly—are process-based.[5]

Even so, Clinton pleads no "actual knowledge of the specifics of Defendants' decision-making process." [Dkt. 1 ¶ 71.] Rather, he relies on "reasonable inferences" and comparisons to other stable value GICs to state his claim. [*Id.* ¶¶ 75, 83–89.] This, then, turns on whether he has plausibly alleged meaningful comparisons and rates of underperformance.[6]

### 1. Meaningful Comparisons

Baxter challenges Clinton's comparisons on two bases. It first argues that his "barebone statement that the alternatives are comparators fails to state a claim of imprudence." [Dkt. 19 at 13.] It also reasons that the complaint's "sample size of comparators (four to six plans per year, often changing each year from 2019 through 2023) is simply too small to support an assertion that the SIF was imprudent." [*Id.* at 18.] Because Clinton's claims rely on allegations of chronic underperformance, his failure to identify a uniform benchmark across the Class Period is fatal.

---

[4] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[5] Underperformance, here, refers to the SIF's allegedly low crediting rates.

[6] Clinton's opposition brief hints at a non-comparator argument based on an "extreme rate reduction in 2019." [Dkt. 30 at 8.] The idea that the Investment Committee acted imprudently for failing to respond to a one-year decline does not appear in his complaint, is not fleshed out, and is undercut by subsequent growth.

4

### a. Comparator Identity

Considerable ink is spilled framing, re-framing, and then debating the question of "whether these purported plans are true comparators." [Dkt. 19 at 14.] But as this court sees it, the inquiry is straightforward. For each year between 2019 and 2023, Clinton identifies four to six "identical or substantially identical stable value funds with higher crediting rates." [Dkt. 1 ¶¶ 84–85.] The question turns on whether this description offers "a *reason* why this comparison is possible—why a peer plan's [rates] are likely to fall within a sufficiently predictable range to be used as a benchmark." *Acosta v. Bd. of Trs. of Unite Here Health*, 2024 WL 3888862, at *7 (N.D. Ill. Aug. 21, 2024) (emphasis in original). In other words, whether Clinton need only compare the SIF to *other* stable value funds (as he did), or whether he must allege an additional layer of likeness.

"A complaint cannot simply make a bare allegation that costs are too high, or returns are too low. Rather, it must provide a sound basis for comparison—a meaningful benchmark." *Albert*, 47 F.4th at 581 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)) (cleaned up). Dismissal is warranted when the "composition of the peer groups remains a mystery," such that there is "no way of knowing whether the peer-group funds provide a 'sound basis for comparison.'" *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (quoting *Meiners*, 898 F.3d at 822).

For example, in dismissing imprudence claims based on the comparative costs of retirement plan expenses, the Seventh Circuit in *Albert* "emphasized the lack of 'allegations as to the quality or type of recordkeeping services the comparator plans provided.'" *Hughes*, 63 F.4th at 632 (7th Cir. 2023) (citing *Albert,* 47 F.4th at 579). It left open, however, "the possibility that recordkeeping claims in a future case could survive the context-sensitive scrutiny of a complaint's allegations courts perform on a motion to dismiss." *Id.* (citing *Albert,* 47 F.4th at 580) (cleaned up). *Hughes* was that future case, and it held sufficient the complaint's assertions that "[t]here are numerous recordkeepers in the marketplace who are *equally capable* of providing a high level of service to large defined contribution plans like the Plans." *Id.* (emphasis in original). Put differently, allegations "that recordkeeping services are fungible and that the market for them is highly competitive" established a plausible basis for comparison. *Id.*

*Albert* and *Hughes* set the contours for prudence analyses under ERISA. *See Acosta*, 2024 WL 3888862, at *7 ("regardless of the type of plan at issue, an ERISA plaintiff alleging excessive costs must give enough 'comparative context' to permit the reasonable inference that the fiduciary is spending too much for what they are getting in return"); *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 829 (N.D. Ill. 2023)

5

(applying *Albert* and *Hughes* to underperformance claims).[7] And nothing in either decision "suggests that [p]laintiffs must identify every possible service provided by peer plans, or describe their administrative structure in exhaustive detail, to allow for a meaningful comparison." *Acosta,* 2024 WL 3888862, at *7. They need only "identify a *reason* why this comparison is possible." *Id. See also Gaines v. BDO USA, LLP*, 663 F. Supp. 3d at 829–30 (denying motion to dismiss where complaint compared underperforming fund to those in same Morningstar category); *Russell v. Illinois Tool Works, Inc.*, 2024 WL 2892837, at *3 (N.D. Ill. June 10, 2024) (same).[8]

Baxter argues that Clinton's allegations fall on the *Albert* side of the dividing line because he "pleads *no* facts about the characteristics of any of the purported comparators." [Dkt. 19 at 9 (emphasis in original).] He correctly observes that the complaint "does not allege that any of the putative comparator plans used *synthetic* stable value funds," as the SIF did. [*Id.* (emphasis added).] Indeed, it never compares "the manner in which assets are held, the exit provisions in the event a plan wants to remove these investment options, the protections each plan offers in the event of insurer default, the methodology for determining crediting rates, or any of the other factors that differentiate different stable value investments." [*Id.*]

Clinton, however, contends that these are "premature factual disputes" ill-suited for a motion to dismiss. [Dkt. 30 at 11.] Following *Hughes*, the court must agree. *See Gaines*, 663 F. Supp. 3d at 829 ("conten[tion] that certain alleged comparator funds have 'obvious flaws,' … is a factual assertion that does not necessitate dismissal").

*Gaines* is particularly instructive. 663 F. Supp. 3d 821. The plaintiff, relying on comparators to allege underperformance-based imprudence, compared the at-issue retirement funds to "other funds in the same fund category and benchmarked to the same index." *Id.* at 828 (cleaned up). The complaint alleged that "each fund in the same category 'share[s] core similarities,'" and defendants acknowledged that "the fact that the funds are in the same category 'mean[s] they all, for example, generally invest in' the same kinds of companies." *Id.* at 829–830. These allegations, in context, were sufficient to support plaintiff's imprudence claim. *Id.* at 829. *See also*

---

[7] Baxter acknowledges *Hughes*'s applicability here: "Defendants do not dispute that a plaintiff can plead a valid process-based prudence claims by pleading meaningful comparisons that support an inference that the process must have been flawed (as is confirmed by Plaintiff's citation to *Hughes II*)." [Dkt. 31 at 7.]

[8] As these decisions demonstrate, *Hughes* established an existent but undemanding standard. The Sixth Circuit acknowledged this in affirming its own more exacting framework. *See England*, 136 F.4th at 638 ("The general allegation that comparable recordkeepers are 'equally capable of providing a high level of service' may have been enough for the *Hughes* court, but it is not specific enough for this one. That allegation explains neither what a 'high level of service' is and what services the plan utilized, nor whether those services were comparable to those provided to the asserted competitors.")

6

*Russell*, 2024 WL 2892837, at *3 (same, when plaintiffs compared underperforming funds to "other Morningstar fund categories benchmarked to the same index").

Clinton's comparators are all stable value GICs, which, as pled, share fundamental attributes. As stated in the complaint, "stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs." [Dkt. 1 ¶ 77.]

Baxter elaborates, citing First and Ninth Circuit caselaw to define SVFs based on their priorities, composition, and approach to risk:

> Stable value funds "emphasize capital preservation rather than maximization of returns," *Tibble v. Edison International*, 729 F.3d 1110, 1136 (9th Cir. 2013), and "generally consist[] of an underlying portfolio of high-quality, diversified, fixed-income securities" and a crediting rate that "take[s] into account gains and losses over time and determines what amount of interest will be credited to investors, and at what intervals this will occur." *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 3 (1st Cir. 2018).

[Dkt. 19 at 7–8.][9] From this, drawing inferences in Clinton's favor, it's reasonable to conclude that meaningful comparison is possible because the SIF shares core similarities with other identified SVFs. That is, to borrow Baxter's own proffered standard, they all "hold similar [types of] securities, have similar [capital preservation-focused] investment strategies, and reflect a similar [low] risk profile." [*Id.* at 12 (citing *Abel*, 2024 WL 307489, at *4).]

There is no doubt that differences exist among SVFs, which Baxter correctly argues can take many forms. [Dkt. 19 at 13–14.] For example, synthetic SVFs "are generally the least risky because principal is guaranteed by multiple wrap providers and plan participants own the assets of the underlying funds." *Miller v. AutoZone, Inc.*, 2020 WL 6479564, at *5 (W.D. Tenn. Sept. 18, 2020). With separate and general

---

[9] The Seventh Circuit, meanwhile, has offered the following description: "SVFs are recognized investment vehicles that are available only through employer-sponsored retirement plans and some college-savings plans. They typically invest in a mix of short- and intermediate-term securities, such as Treasury securities, corporate bonds, and mortgage-backed securities. Because they hold longer-duration instruments, SVFs generally outperform money market funds, which invest exclusively in short-term securities. To provide the stability advertised in the name, SVFs are provided through 'wrap' contracts with banks or insurance companies that guarantee the fund's principal and shield it from interest-rate volatility." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013) (citing Adam Zoll, *For Safety–First Savers, Stable–Value Funds Are Tough to Beat*, http://news.morningstar.com/articlenet/article.aspx?id=592164) (cleaned up).

7

account products, the insurance carriers own the underlying funds, posing additional levels of risk associated with increasingly higher credit rates. *Id.*

In *Coppel v. SeaWorld Parks & Ent., Inc.*, 2024 WL 3086702 (S.D. Cal. Jan. 31, 2024), a California district court held that general account SVFs could not "typically serve as a meaningful benchmark for" a separate account SVF "absent 'sufficient factual allegations from which it could be inferred that the [general account SVFs] at issue could serve as meaningful benchmarks.'" 2024 WL 3086702, at *15 (citing *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *7). But the *Coppel* court was not bound by the Seventh Circuit's precedent in *Hughes*. Further, the complaint in *Coppel* "consistently disparages general account products as more risky," *id.*, whereas Clinton's complaint is silent on any purported differences.

Clinton also contests the relevance of any differences, arguing in response to Baxter's motion that "(1) 'the type of stable value funds' does not affect Defendants' ability to achieve a better rate; (2) all SVFs 'protect plaintiffs' assets' so it does not matter 'whether the plan owns the underlying assets;' (3) Defendants do not explain (nor would it matter) how *less* protection 'in the event of insurer default' would logically justify a *lower* rate because Plaintiff would be taking on more risk." [Dkt. 30 at 11–12 (alterations accepted).]

Therefore, where the complaint alleges only that all stable value funds provide plan participants a low-risk option, any differences in degree (and their relevance) are questions for another day. *See Miller v. Astellas US LLC,* 2021 WL 1387948, at *5 (N.D. Ill. Apr. 13, 2021) ("factual disputes regarding the aptness of the comparisons … are inquiries that are inappropriate to resolve at this stage of the case").

Courts in the Eighth Circuit, faced with comparisons between separate and general account products, have reached similar conclusions. In *Lacrosse v. Jack Henry & Assocs.*, 2024 WL 3564575, at *3 (W.D. Mo. July 11, 2024), a Missouri district court endorsed plaintiff's argument that "[f]rom the perspective of a plan participant or investor, they [allegedly] provide the same benefit. They are a stable value fund offering which provide a conservative, stable rate of return. Defendants offer no explanation as to why the [separate account GICs] would not be a reasonable substitute for a plan participant seeking to invest in a stable fund option." *See also Payne v. Hormel Foods Corp.*, 2024 WL 4228613, at *7 (D. Minn. Sept. 18, 2024) ("[though] general account GICs and separate account GICs have different risk profiles, they are sufficiently similar to serve as meaningful benchmarks… *stable value GICs provide the same benefits and expectation of returns*" (emphasis added)). This court agrees. Put differently, the distinctions are not so obviously pertinent as to necessarily explain away the crediting rate disparities.

8

To be sure, Clinton's description of comparators as "identical or substantially identical stable value funds" passes muster not because he alleges, in conclusory fashion, that they are identical or substantially identical. [Dkt. 1 ¶ 84.] Rather, it succeeds at this stage because he limits his universe to a category of funds which he describes as characteristically "intended to provide participants with an option that protects their assets and is shielded from risks of loss." [*Id.* ¶ 77.] In doing so, he provides his reason for why the comparison is possible.[10]

### b. Sample Size and Composition

Even so, Clinton errs—not by selecting his comparators from a pool of stable value funds, but by failing to identify a uniform sample. As discussed, it does not suffice to merely point to a better-performing investment; the comparison must give rise to a plausible theory of imprudence. Clinton necessarily and correctly responds to arguments about hindsight by emphasizing that the Investment Committee not only agreed to contracts for set returns, but that it also renewed them. [Dkt. 30 at 9.] And it did so, Clinton says, despite constructive knowledge that other funds were achieving better crediting rates. [*Id.* at 9–10.]

But to sustain his 'chronic underperformance' argument, Clinton's comparisons must show persistent underperformance. His data points are four to six comparators each year from 2019 to 2023—none of which appear across all five years. The closest he comes to providing a year-to-year comparator are two funds analyzed from 2019 through 2022, but not in 2023. The rest make one or two appearances, and in the latter case, often non-consecutively. All the complaint shows, then, is that the SIF doesn't boast one of the top four to six crediting rates in a given year. There is no consistent benchmark.

It is axiomatic that "the ultimate outcome of an investment is not proof of imprudence." *Albert*, 47 F.4th at 579. Therefore, Clinton must show—at minimum—that there were year-in, year-out better-performing alternatives that cast doubt on the Investment Committee's process for monitoring and renewing its own funds. He provides none, only a rotating cast of other funds with higher crediting rates. This alone cannot support a claim of imprudence, or else—by a plaintiff's cherry-picking—all but a handful of funds each year would be subject to such attacks, even without a clear alternative.

For this reason, the court grants the motion to dismiss Count I.

---

[10] Consider the scenario where Clinton alleged explicitly that 'other funds—*which similarly provide participants an option that protects their assets and is shielded from risks of loss*—had higher crediting rates and were available but not selected by Defendants.' Baxter's argument, that he "pleads *no* facts about the characteristics of any of the purported comparators," would feel hollow. But that's effectively what the complaint says, only broken into discrete allegations.

9

### 2. Crediting Rates

Baxter raises two additional challenges, both related to the comparator plan crediting rates. It first argues that "the calculations used to support [Clinton's] theory of underperformance are deeply flawed," because "the 'crediting rate' in the Complaint is instead an estimate calculated based on the 'interest credited divided by the end of year balance' in the Form 5500." [Dkt. 19 at 15.] It then argues—notwithstanding any errors—that the "minor differences … between the Plan's crediting rate and those of the putative comparators are insufficient to support an inference of imprudence." [*Id.* at 17.] For the purposes of any amended complaint, the court reviews these arguments.

Baxter contends that Clinton's estimations "cannot be trusted or relied on to suggest fiduciary breach." [Dkt. 19 at 17.] He cites to *Woznicki v. Aurora Health Care Inc*, 2022 WL 1720093 (E.D. Wis. May 27, 2022), where a Wisconsin district court rejected a complaint's approximation of recordkeeping fees-per-participant because its calculations "include[d] fees unrelated to recordkeeping and administration and exclude[d] recordkeeping fees paid via indirect compensation." 2022 WL 1720093, at *3. Though noting that, at the pleading stage, it would normally "accept a plaintiff's back-of-the-napkin math as good enough," it concluded that "[d]eference to an approximation is inappropriate … when, as here, the calculations are facially and demonstrably wrong." *Id.*

Baxter's concerns are three-fold: (1) that the complaint divides interest by the year-end balance, which *includes* accrued interest; (2) that it fails to consider money entering or exiting the funds during the year; and (3) that the calculated rates are "below minimum crediting rate guarantees, or otherwise in conflict with the crediting rates specified by the plans' own disclosures." [Dkt. 19 at 16–17.] In support, it attaches the comparators' Form 5500 disclosures and cites its summary of available crediting rate information.[11] [Dkt. 20–3.]

As Baxter acknowledges, Clinton *under*estimates crediting rates by dividing interest by year-end balance, which includes interest. [Dkt. 19 at 16 ("if a $100 balance accrued simple interest at a crediting rate of 5%, the end balance after a year would be $105. However, under Plaintiff's methodology, the $5 in interest credit would be divided by the $105 end balance. Thus, instead of calculating the correct rate of 5%, Plaintiff would wrongly estimate a crediting rate of 4.76%.")] Since Clinton is alleging that the SIF's crediting rates are too low, this miscalculation would help Baxter only if its own rates were underestimated to an extent greater than that of the comparators. The opposite, however, is true. Compared to the other estimates,

---

[11] Because Clinton references the Form 5500s in his complaint, the court may consider them at this posture. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). And "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls." *Id.*

Baxter's crediting rates receive the lowest bump when subtracting interest from the year-end balance. Regardless, even if the error is not itself fatal, Clinton should correct it in any amended pleading.

Baxter's second concern, which is similar to the issues identified in *Woznicki*, is the most compelling. But unlike in *Woznicki*, where the complaint included patently irrelevant data in (and excluded patently relevant data from) its calculations, Clinton's error is speculative. Baxter observes that the methodology "fails to consider the effect of money entering or exiting the funds during the year." [*Id.*] This could skew estimates in either direction, since a mid- or late-year influx (or disbursement) would result in a year-end balance that inaccurately reflects the funds that accrued interest. But viewing this in a light most favorable to Clinton, as is required on a motion to dismiss, it's also possible that any entries and exits occurred near or at the start of the year, affecting estimates negligibly, if at all. The lack of facial and demonstrable error makes this more akin to the "back-of-the-napkin math" that the court in *Woznicki* would have been willing to accept. *See* 2022 WL 1720093, at *3.

Finally, Baxter states that Clinton "repeatedly calculated and alleged rates that were below minimum crediting rate guarantees, or otherwise in conflict with the crediting rates specified by the plans' own disclosures." [Dkt. 19 at 17.] But, again, arguing that Clinton *underestimated* others' crediting rates does little to undercut allegations of comparative underperformance. To the extent Baxter is simply arguing that "Plaintiff's calculations cannot be trusted or relied on," the margins between Clinton's estimates and any available information are relatively small.[12] [*Id.*] Meanwhile, Baxter's inability to identify precise—or in some cases, any—rates shows the import of approximations. Lacking complete information, Clinton's approach would be sufficient at this posture.

Regardless, Baxter argues that any difference between the SIF and comparator funds is "'simply too small' to raise a plausible breach of fiduciary duty claim." [Dkt. 19 at 18 (quoting *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021)). Since the average rates of return will necessarily change in an amended complaint,[13] the court declines at this juncture to identify what, if any, threshold exists. It simply reiterates that, as with everything else, the inquiry is context specific, and the motion-to-dismiss touchstone is plausibility.

---

[12] From Baxter's own summary, seven of the estimated comparator credit rates were within reported ranges and nine were low. Only two were high—by just 0.08 and 0.03. [*See* Dkt. 20-3.]

[13] Clinton should also address Baxter's contention that he erred in "giving each [GIC] equal weight in estimating the consolidated 'rate' for the SIF." [Dkt. 19 at 17.]

B.  **Duty to Monitor**

Clinton concedes that Count II, the Company's duty to monitor the Investment Committee, is wholly "derivative of the underlying claim in Count I." [Dkt. 30 at 16.] *See also Albert*, 47 F.4th at 583 ("duty to monitor claims rise or fall with [] duty of prudence"). Therefore, the motion to dismiss Count II is also granted.

IV. **Conclusion**

For the foregoing reasons, the motion to dismiss is granted without prejudice.

Enter: 25-cv-3368
Date: December 3, 2025

_____
Lindsay C. Jenkins